**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LYUBOV GORE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JORDAN W. BUSKIRK, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.28A01-1404-CR-172 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE GREENE SUPERIOR COURT
The Honorable Dena A. Martin, Judge
Cause No. 28D01-1306-MR-001

**September 5, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Jordan D. Buskirk pleaded guilty pursuant to a plea agreement to murder, conspiracy to commit murder as a class A felony, conspiracy to commit rape as a class B felony, and criminal confinement as a class C felony. The trial court imposed an eighty-one-year executed sentence. Buskirk challenges his sentence, presenting the following three issues:

1. Did the trial court err in finding as an aggravating circumstance that Buskirk lacked remorse for his actions?

2. Did the trial court abuse its discretion in ordering his sentences for murder and conspiracy to commit rape to be served consecutively?

3. Is the sentence imposed inappropriate in light of Buskirk's character and the nature of his offenses?

We affirm.

The facts as admitted by Buskirk are that Buskirk and Randal E. Crosley planned to kill and rape someone, with the victim to be randomly selected. In preparation, they purchased handcuffs, condoms, an anal sex toy, and positional restraints. They also purchased two ropes and an anchor. At approximately 8 p.m. on June 5, 2013, they met with Kaitlyn Wolfe, an acquaintance, to deliver drugs. They dropped off Wolfe at her home. Later that evening, Wolfe contacted them and requested a second drug purchase. Buskirk and Crosley picked her up near her home. Although Wolfe was not their original target, the two men decided that she was going to be their victim. They drove her to a rural area, where they attacked her in the car, climbed on top of her, and wrapped duct tape around her mouth. When Wolfe struggled with her assailants outside of the vehicle,

2

Buskirk handcuffed Wolfe's hands behind her back. Crosley placed a shirt over her head and duct-taped it to her face. Crosley then punched Wolfe in the face several times. She was choked until she stopped struggling. When she again began to struggle, Crosley duct-taped her ankles to prevent her from running away. Crosley told Buskirk that Wolfe "needed to die." *Transcript* at 47. Buskirk wrapped a rope around Wolfe's neck and strangled her until she stopped moving. The men then loaded her body into the trunk of their car and drove away. The men took drugs for a while before driving to a rural area, where they stopped, removed Wolfe's body from the trunk of the car and bound her with ropes such that she was tied in a fetal position. Then they attached the anchor to the ropes with a carabineer and placed her back in the trunk. They proceeded to a nearby lake, where they threw her body off at a high wall into the water.

After Wolfe's family reported her missing the next evening, police obtained Wolfe's phone records and began contacting people with whom she had made contact in the evening she disappeared. This led them to Buskirk. Buskirk denied knowing anything about Wolfe's disappearance. Further investigation revealed that Wolfe's cell phone had been in the same location as Buskirk's and Crosley's cell phones late in the evening of June 5 and into the morning of June 6. This was inconsistent with Buskirk's statements to police regarding his contact with Wolfe on the night of her disappearance. Police again questioned Buskirk, who this time invoked his right to counsel. After consulting counsel, Buskirk reported that he and Crosley had seen Wolfe twice that evening, but that she was alive the last time they saw her. He then failed a polygraph examination. Around the time

3

of the polygraph interview, Wolfe's body was found in the lake. After again consulting with counsel, Buskirk confessed to the events set out above. Buskirk guided police to the various locations where the incident unfolded, leading to the discovery of considerable physical evidence that corroborated his account of what had occurred.

Buskirk entered into a negotiated plea agreement whereby he agreed to plead guilty as set out above, to cooperate with the State, and to testify against Crosley. Sentencing was left to the trial court's discretion except that the State agreed the sentences for murder, conspiracy to commit murder, and criminal confinement would run concurrently to each other. It was left to the trial court's discretion to decide whether the sentence for conspiracy to commit rape would run concurrently or consecutively to the other sentences. Following a sentencing hearing, the court identified two aggravating circumstances: (1) Buskirk showed little to no remorse for his actions; and (2) the "heinous cold calculated" nature and circumstances of his crimes. *Id.* at 100. In discussing proffered mitigating circumstances, the court stated:

> [Y]es you have a child, you have a small child a 3 year old child, but you knew you had that 3 year old child when you did this. I can't give a whole lot of weight to that these are your actions [sic]. You have no criminal history, but man when you started out, you started out big. You are a convicted murderer, so again that is not going to hold a whole lot of weight. The Court is going to give you credit for being cooperative. You cooperated after you failed a polygraph examination. I will give you some credit for being cooperative. But again not a whole lot because you had already failed

4

that polygraph, the body had been found, they had the videos from Gander Mountain,[1] so those are your mitigating circumstances[.]

*Id.* at 99. The court concluded that the aggravating circumstances "far, far outweigh the mitigating circumstances." *Id.* The court imposed sentences of sixty-three years for the murder conviction, fifty years for the conspiracy to commit murder conviction, and eight years for the criminal confinement conviction. Pursuant to the plea agreement, those sentences were ordered to be served concurrently. The court imposed an eighteen-year sentence for the conviction of conspiracy to commit rape, which was ordered to run consecutively to the other sentences, resulting in an executed sentence of eighty-one years.

1.

Buskirk contends the trial court abused its discretion in finding as an aggravating circumstance that he lacked remorse.

Trial courts are required to enter a sentencing statement when imposing a sentence for a felony offense. This statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. *Anglemyer v. State,* 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218. If the court finds aggravating or mitigating circumstances, it "must identify all *significant* mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating." *Anglemyer v. State,* 868 N.E.2d at 490 (emphasis supplied). An abuse of

---

[1] A surveillance video from Gander Mountain recorded Buskirk and Crosley purchasing carabineers, an anchor, two ropes, and candy on June 4, 2013.

discretion in identifying or failing to identify aggravators and mitigators occurs if it is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* (quoting *K.S. v. State,* 849 N.E.2d 538, 544 (Ind. 2006)). Finally, a trial court may properly find lack of remorse to be an aggravating factor at sentencing. *Veal v. State*, 784 N.E.2d 490 (Ind. 2003).

At the sentencing hearing, the court noted that Buskirk had appeared in court two weeks before and "explain[ed] to a courtroom full of people what happened." *Transcript* at 100. As he did so, the court observed that it "didn't see the first tear that day. Not one." *Id.* Remorse is a feeling, one that is aptly defined as "a gnawing distress arising from a sense of guilt for past wrongs." Merriam Webster's Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/remorse (last visited on August 21, 2014). Because feelings cannot be directly observed, they must be deduced from a person's behavior. The trial court was in an optimal position to observe Buskirk's behavior throughout the legal proceedings culminating in his conviction and sentencing. Therefore, the trial court was well-positioned to assess whether Buskirk's behavior evinced genuine distress arising from guilt for what he had done. The court found that it did not. This was based at least in part, and perhaps in large part, upon Buskirk's apparently emotionless, detailed recounting of Wolfe's murder – a series of events that spanned three different locations and took some time. This strikes us as a reasonable finding. In any event, a trial judge who personally views a defendant's demeanor and witnesses the defendant's

6

expression of remorse is, relative to this court, in a far superior position to determine whether that expression reflects genuine remorse. The trial court did not abuse its discretion in finding a lack of remorse to be an aggravating circumstance.

2.

Buskirk contends the trial court abused its discretion in ordering his sentences for murder and conspiracy to commit rape to be served consecutively. This contention has three bases. First, Buskirk contends that the written sentencing statement "suggests the trial court did not engage in the proper balancing of mitigating and aggravating circumstances required for imposition of consecutive sentences." *Appellant's Brief* at 17. The only rationale for consecutive sentences provided in the trial court's written sentencing order is the following statement: "The Court finds after considering the aggravating and mitigating circumstance of these crimes of violence, Count 3 shall run consecutive to the other counts." *Appellant's Appendix* at 7. Noting that the trial court identified multiple aggravating and mitigating circumstances at the sentencing hearing, Buskirk contends that the use of the singular form of "circumstance" in the written sentencing order does not reflect that it carefully considered all of the previously identified aggravating and mitigating circumstances.

Our review of sentences in noncapital cases is not limited to the sentencing court's written sentencing statement. We also may consider the trial court's comments in the transcript of the sentencing proceedings. *McElroy v. State*, 865 N.E.2d 584 (Ind. 2007). The comments accompanying the court's pronouncement of sentence reflect that it was

7

cognizant of the aggravating and mitigating circumstances it had identified following the presentation of evidence at the sentencing hearing. For instance, the trial court noted the three mitigating circumstances proffered by Buskirk, i.e., (1) Buskirk has a small child, (2) Buskirk had no criminal history, and (3) Buskirk was ultimately cooperative with police after initially denying involvement in Wolfe's murder. The trial court's subsequent comments, however, reflect that the trial court discounted the mitigating weight of each of those proffered mitigators. Later, the court stated that the aggravating value of the nature and circumstances of Buskirk's offenses "far, far, outweigh[ed] the mitigating circumstances." *Transcript* at 100 (emphasis supplied). In short, viewed as a whole, the record reflects that the trial court did indeed consider all of the aggravating and mitigating circumstances in determining Buskirk's sentence. There was no error in this respect

Buskirk's second challenge to consecutive sentences is premised largely upon his claim in Issue 1 above, i.e., that the trial court erred in finding as an aggravating circumstance that he lacked remorse. Because Buskirk failed to prevail in establishing the premise, the argument upon which it depends fails.

Thirdly, Buskirk contends "consecutive sentencing also was an abuse of discretion because it resulted in Buskirk receiving the same 81-year sentence as Crosley." *Appellant's Brief* at 19. This means, according to Buskirk, that the trial court gave him "no credit for having cooperated so extensively with police." *Id.* We can find no authority for undertaking the sort of comparison of sentences that Buskirk invites. Moreover, it appears that Buskirk and Crosley were equally involved in the murder of Wolfe at all stages of this

cruel and callous criminal endeavor. Because they were equally involved and equally culpable, the fact that ultimately they received sentences of the same length does not strike us as unjust, notwithstanding that Buskirk began cooperating with police before Crosley did.

3.

Buskirk contends his sentence is inappropriate in light of his character and the nature of his offense. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Buskirk bears the burden on appeal of persuading us that his sentence is inappropriate. *Conley v. State*, 972 N.E.2d 864.

The determination of whether we regard a sentence as appropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell v. State,* 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*,

9

989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived 'correct' sentence in each case. *Knapp v. State*, 9 N.E.3d 1274. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original). Our Supreme Court has indicated that, when analyzing the appropriateness of a criminal sentence, there is "no right answer ... in any given case." *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (quoting *Cardwell v. State,* 895 N.E.2d at 1224). Rather, appellate review and, where appropriate, revision "ultimately boils down to the appellate court's 'collective sense of what is appropriate, not a product of a deductive reasoning process.'" *Id.* (quoting *Cardwell v. State*, 895 N.E.2d at 1225). Ultimately, we "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.*

In order to assess the appropriateness of a sentence, we first look to the statutory ranges established for the classification of the relevant offenses. Buskirk was convicted of murder, one class A felony, one class B felony, and one class C felony. The advisory sentences for these classifications of offense are fifty-five years, thirty years, ten years, and four years, respectively. The maximum sentence for these same classifications of offense are sixty-five years, fifty years, twenty years, and eight years, respectively. In Buskirk's case, the trial court imposed sixty-three years for the murder offense, the maximum fifty years for the offense of conspiracy to commit murder, eighteen years for the offense of

10

conspiracy to commit rape, and the maximum eight years for the criminal confinement offense. The combination of concurrent and consecutive sentences imposed by the trial court resulted in an aggregate executed sentence of eighty-one years.

We begin with a consideration of the nature of Buskirk's offenses. "In considering the nature of the offense we recognize the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014). The trial court imposed a sentence based upon its finding of aggravating and mitigating circumstances. We are not limited to those mitigators and aggravators, however, in analyzing a claim under App. R. 7(B). *Fuller v. State*, 9 N.E.3d 653. Buskirk decided to rape and murder someone just for the experience of it. He methodically prepared by purchasing equipment and materials to aid him in his criminal endeavors. He selected his victim at random. As it turned out, the victim was someone known to him, even if casually, and toward whom he presumably bore no animosity. This makes the selection of Wolfe as his victim even more chilling. After selecting Wolfe as his victim, Buskirk and his confederate drove Wolfe to an isolated location, where Buskirk and Crosley bound and gagged her with duct tape, handcuffed her, and beat her. When he decided to kill Wolfe, Buskirk wrapped a rope around her neck and strangled her. Then, with Wolfe's body in the trunk, the men drove around the area and took drugs. After doing this for a while, they hog-tied Wolfe's body, attached an anchor to her, and discarded her in a lake. We agree with the trial court's characterization of the facts and circumstances of this murder as "heinous", "cold", and "calculated". *Transcript* at 100.

11

Turning now to Buskirk's character, it is true that he eventually cooperated with police and that this cooperation ultimately played a role in Crosley's confession. The trial court, however, was not far from the mark in observing that Buskirk's cooperation was largely pragmatic in that the evidence against him was compelling and still mounting at the time he decided to cooperate. The depraved nature of Wolfe's murder, not Buskirk's eventual, pragmatic cooperation, is the most telling reflection of his character. In light of the nature of Wolfe's murder and what it revealed of Buskirk's character, we are not persuaded that the eighty-one-year sentence imposed by the trial court is inappropriate.

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.